# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00169-CV

**Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, successor to John Cornyn, Attorney General of the State of Texas, Appellants**

**v.**

**Lexington Insurance Company, Landmark Insurance Company, and American International Specialty Lines Insurance Company, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. GN100569, HONORABLE CHARLES F. CAMPBELL, JUDGE PRESIDING

## O P I N I O N

This case concerns a dispute between the Comptroller of Texas[1] and three surplus lines insurance companiesCLexington Insurance Company, Landmark Insurance Company, and American International Specialty Lines Insurance Company (collectively, the Insurers[2])Cover the Comptroller=s assessment of premium taxes on certain of their issued policies. The Insurers contend that the unauthorized

---

[1] The Attorney General of the State of Texas, Greg Abbott, is also an appellant in this case. Because the interests of the Attorney General and of the Comptroller coincide, we will refer to appellants collectively as Athe Comptroller.@

[2] When the Insurers= interests diverge, we will refer to them individually.

insurance premium tax does not apply to eligible surplus lines insurers. The Comptroller asserts that although eligible to issue surplus insurance in Texas, the Insurers were required to issue the policies through licensed Texas surplus lines agents; otherwise, they conducted unlawful and unauthorized insurance and were subject to the tax. Because the Insurers have not produced evidence that the policies were issued through licensed agents, argues the Comptroller, they are liable for the tax. After unsuccessfully pursuing lengthy redetermination proceedings with the Comptroller, the Insurers paid their respective taxes under protest and sought a refund in district court. The district court granted the Insurers= summary-judgment motion and ordered the Comptroller to refund the taxes, declaring that Former Article 1.14-1, ' 11(a)[3] does not apply to eligible surplus lines insurers. Because we hold that surplus lines policies must be issued through licensed Texas agents or be independently procured to avoid the tax under article 1.14-1, ' 11(a), we reverse the judgment of the trial court and remand this cause for further proceedings consistent with this opinion.

**BACKGROUND**

---

[3] Although the district court=s order refers to the current statute, section 101.251 of the insurance code, we will refer to Former Article 1.14-1, ' 11(a), in effect at the time of this dispute. *See* Act of May 22, 1989, 71st Leg., R.S., ch. 242, ' 1, 1989 Tex. Gen. Laws 1151, 1151, *amended by* Act of May 27, 1993, 73d Leg., R.S., ch. 999, ' 6, 1993 Tex. Gen. Laws 4373, 4375, *repealed by* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, ' 5, 1999 Tex. Gen. Laws 486, 538 (hereinafter cited as Former Article 1.14-1, ' 11(a)).

Surplus lines insurance allows a person who seeks to insure a Texas risk but is unable to obtain that insurance from a Texas-licensed insurer to seek the insurance from an insurer who is not licensed in Texas but is an Aeligible@surplus lines insurer. *See* Tex. Ins. Code Ann. ' 981.001 (West Supp. 2003). An insurer is an Aeligible@ surplus lines insurer if it meets certain minimum capital and surplus requirements outlined in the insurance code.[4] *See* Tex. Ins. Code Ann. ' ' 981.002(1), .057 (West Supp. 2003).[5] The Insurers here are not licensed in Texas but are Aeligible@ to issue surplus lines insurance in the state.

---

[4] There is no dispute that the Insurers are Aeligible@ surplus lines insurers, as defined under the insurance code: AAn eligible surplus lines insurer must maintain capital and surplus in an amount of at least $15 million [or] [i]f an eligible surplus lines insurer is an insurance exchange created by the laws of another state . . . [it must meet certain detailed capital and surplus requirements].@ *See* Tex. Ins. Code Ann. ' 981.057 (West Supp. 2003).

[5] The Texas Insurance Code has undergone recodification in recent years. For the sake of convenience, when a cited provision has not substantially changed from that in effect during the time relevant to this dispute, citation will be to the current insurance code.

3

The Comptroller audited the Insurers for the years 1992 to 1995, found a tax deficiency, and imposed unauthorized insurance premium taxesC$362,975.97 against American International Specialty Lines Insurance Company (American International), $6,956,251.08 against Lexington, and $151,599.99 against Landmark.[6] The insurance policies for which the taxes were assessed insured Texas risks on subjects either resident, located, or to be performed in Texas. To conduct its audit and deficiency determination, the Comptroller used records obtained from the surplus lines stamping office, which is created under the authority of the insurance code to review and record surplus lines insurance contracts placed by licensed Texas surplus lines agents and to assist the Commissioner of Insurance in evaluating the eligibility of surplus lines insurers. *See id.* '' 981.151, .154, .158 (West Supp. 2003). Texas-licensed surplus lines agents must file a copy of every policy placed through them with the stamping office within sixty days of a policy=s effective or issue date. *See id.* ' 981.105 (West Supp. 2003). The policies for which the Comptroller assessed the taxes were not reported to the surplus lines stamping office by licensed Texas surplus lines agents.

### *Procedural history*

The tax code allows a person who has a direct interest in a tax-deficiency determination to petition the Comptroller for a redetermination. *See* Tex. Tax Code Ann. ' 111.009 (West 2001). About a year after the Comptroller initially assessed the deficiency against American International, the Comptroller

---

[6] The amounts assessed have fluctuated over the course of the proceedings due to agreed reductions, proof the Insurers have presented, and interest.

4

reduced American International=s liability because it provided evidence that taxes had been paid on some of the policies at issue. With respect to the remaining assessed deficiency, American International timely requested a redetermination, claiming that Former Article 1.14-1, section 11 did not apply to it as an eligible surplus lines insurer. The Administrative Hearings Section of the Comptroller=s office held a hearing in 1998 or early 1999 on American International=s request. The Tax Division of the Comptroller=s office represented the Comptroller. In June 1999, the administrative law judge (ALJ) recommended that the audit assessment be affirmed, and the Comptroller accepted this recommendation in an order. American International timely paid its tax under protest on June 21, 1999, indicating this intent in a letter submitted with the payment that reiterated the legal arguments it had been alleging over the course of the redetermination proceedings. The Tax Division agreed to American International=s motion for rehearing, to allow the insurer an opportunity to produce records evidencing payment of the tax or use of licensed agents. After another hearing, the ALJ issued a recommendation in May 2000 to affirm the audit assessment, as reduced by agreement between American International and the Tax Division, which the Comptroller incorporated into an order. On June 8, 2000, American International filed another motion for rehearing. The ALJ recommended denial of the motion, and the Comptroller accepted this recommendation in an order in August 2000. American International filed a suit for judicial review in September 2000 seeking a declaratory judgment, an injunction, and refund of the taxes it paid under protest.

In December 1997, Lexington and Landmark filed a timely redetermination request upon receiving their deficiency assessments. They contended that the Comptroller had no jurisdiction to label them unauthorized insurers in order to assess the unauthorized premium tax; only the Department of

5

Insurance could declare them unauthorized. Lexington and Landmark=s proceedings were consolidated, and a hearing was conducted in September 1998. The Administrative Hearings Section conducted redetermination hearings and undertook extensive information-gathering from Lexington and Landmark and the stamping office, attempting to determine whether any of the policies at issue had been placed through licensed Texas agents or independently procured. *See* Former Article 1.14-1, ' 11(a). In June 1999, the ALJ recommended that the audit assessments as to Lexington and Landmark be affirmed, with a reduction in the tax due from Lexington based on records it had produced. The Comptroller signed the ALJ=s decision. The Tax Division and Lexington and Landmark then filed an agreed motion for rehearing to allow the insurers further opportunity to prove that additional policies had been issued through licensed agents. The insurers conducted extensive research of their records, contacting various brokers to obtain any relevant records on the policies at issue. After another hearing, the ALJ issued a recommendation in November 2000 that, with certain agreed reductions in the amounts owed, the taxes assessed against Lexington and Landmark be affirmed. The Comptroller signed an order accepting these recommendations, which required the payment of the taxes within twenty days. Lexington and Landmark timely paid the taxes under protest on November 22, 2000, accompanying their payment with a letter stating that the payment was made under protest, indicating that a motion for rehearing would be timely filed, and outlining the reasons why the taxes were not due. On the same day, Lexington and Landmark filed a motion for rehearing, asking the Comptroller to refund the taxes paid under protest and reiterating their arguments developed throughout the redetermination proceedings. After reviewing the issue over the next few months, the Comptroller denied this motion for rehearing in February 2001. On February 22, 2001, Lexington and

6

Landmark filed their suit for judicial review seeking declaratory judgment, an injunction, and a refund of the taxes paid under protest.

In June 2001, the three Insurers filed a motion to consolidate their individual suits, which the trial court granted. Subsequently, the Insurers filed a motion for summary judgment, arguing that article 1.14-1, section 11(a) did not apply to eligible surplus lines insurers, and thus they were entitled to a refund of the taxes paid under protest. The trial court granted summary judgment for the Insurers, ordering the Comptroller to refund the taxes. The Comptroller brings this appeal, asserting that (1) the trial court did not have jurisdiction over the refund suits because the Insurers did not exhaust administrative remedies, (2) the trial court did not have jurisdiction to render declaratory judgment because such action cannot stand on its own in the absence of a refund suit, and (3) the Insurers are liable for the unauthorized insurance premium tax because they failed to comply with statutory requirements to lawfully conduct surplus lines insurance.

## DISCUSSION

*Exhaustion of administrative remedies*

The Comptroller contends that the Insurers failed to exhaust administrative remedies before filing their refund suits, depriving the trial court of jurisdiction to consider their refund requests. *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex. 2002) (court has no jurisdiction if plaintiff fails to exhaust administrative remedies); *Hill v. Board of Trustees*, 40 S.W.3d 676, 679 (Tex. App.CAustin 2001, no pet.) (same). The Insurers filed their lawsuits under section 112.151 of the tax code, pertaining to refund suits. *See* Tex. Tax Code Ann. ' 112.151 (West 2001). Although the Insurers

7

paid their respective taxes under protest with accompanying protest letters, the Comptroller asserts that the Insurers= protest letters cannot be construed as the Arefund claims@ required under sections 111.104 and 112.151 of the tax code. *See Burgess v. Gallery Model Homes, Inc.*, 101 S.W.3d 550, 558 (Tex. App.CHouston [1st Dist.] 2003, pet. denied) (Comptroller has exclusive jurisdiction to resolve tax refunds, and party must exhaust such remedy before filing refund suit under tax code section 112.151); *Bullock v. Marathon Oil Co.*, 798 S.W.2d 353, 360-61 (Tex. App.CAustin 1990, no writ) (to maintain action against Comptroller for tax refund, party must meet requirements of tax-protest law). The Comptroller notes that although the protest letters and payments set the stage for a protest suit under section 112.052 of the tax code, the Insurers failed to file such suit within ninety days of making their protest payments, foreclosing that avenue of relief. *See* Tex. Tax Code Ann. ' 112.052(b). Thus, concludes the Comptroller, the Insurers did not comply with the mandatory and exclusive administrative remedies required under the tax code, and the district court did not have jurisdiction over these causes.

The Insurers rejoin that their protest-payment letters were, in substance, refund claims, although they did not use the magic word Arefund.@ Additionally, they filed motions for rehearing, and these motions were denied by the Comptroller, also administrative requirements. *See id.* ' 112.151. Finally, they filed suit within thirty days from when the Comptroller denied their final motions for rehearing. *See id.* Thus, they contend that they exhausted their administrative remedies, and the trial court properly assumed jurisdiction of their suits. To resolve this dispute, we turn first to the protest letters themselves.

American International=s letter submitted with its protest payment reads, in pertinent part:

8

Dear Comptroller Rylander:

On behalf of the above-captioned eligible surplus lines insurance company, we hereby hand you a check in the amount of $362,975.97 . . . .  This payment is made under protest for the following reasons which will be stated more fully in the motion for rehearing which will be timely filed: [American International is not subject to taxation under article 1.14-1, '11(a); Comptroller has no jurisdiction to assess the tax; disputed tax has been paid already by licensed surplus lines agents; Comptroller has usurped authority of Commissioner of Insurance in declaring American International unauthorized; tax statute is to be construed against agency; Comptroller did not meet burden of proof to declare American International unauthorized; and American International was deprived fair hearing when Comptroller treated a prior decision on a similar topic as determinative of this dispute].

Lexington and Landmark=s joint protest letter reads substantially the same, although outlining their reasons in more detail.  On the face of the protest letters, therefore, the Comptroller is correct that the Insurers did not explicitly ask for a Arefund.@[7]  Thus, we consider whether their protest letters can reasonably be construed as Arefund claims@ under sections 111.104 and 112.151 of the tax code.[8]

---

[7]    The Insurers, in their respective final motions for rehearing filed on June 8, 2000, for American International and on November 22, 2000, for Lexington and Landmark, did ask the Comptroller for a refund of the taxes paid under protest.

[8]    Section 111.104 provides in relevant part:

(b)  A tax refund claim may be filed with the comptroller by the person who paid the tax or by the person=s attorney, assignee, or other successor.

(c)  A claim for refund must:

(1)  be written;

(2)  state the grounds on which the claim is founded; and

9

(3)  be filed before the expiration of the applicable limitation period . . . .

Tex. Tax Code Ann. ' 111.104 (West 2001).

Section 112.151 provides in relevant part:

(a)  A person may sue the comptroller to recover an amount of tax, penalty, or interest that has been the subject of a tax refund claim if the person has:

(1)  filed a tax refund claim under Section 111.104 of this code;

(2)  filed, as provided by Section 111.105 of this code, a motion for rehearing that has been denied by the comptroller; and

(3)  paid any additional tax found due in a jeopardy or deficiency determination that applies to the tax liability period covered in the tax refund claim.

(b)  The suit must be brought against both the comptroller and the attorney general and must be filed in a district court.

(c)  The suit must be filed before the expiration of 30 days after the issue date of the denial of the motion for rehearing or it is barred.

*Id.* ' 112.151 (West 2003).

It is difficult to conclude that the Insurers= protest letters alone could reasonably be construed as Arefund claims@because they do not ask for a refund or in any other language seek the return of their money paid under protest. It is their respective motions for rehearing that ask for a refund. The statute is clear: a *refund claim* must be written, state the grounds on which the claim is founded, and be filed before the expiration of the applicable limitation period. *See* Tex. Tax Code Ann. ' 111.104. The statute does not explicitly require that the word Arefund@be used in a refund claim, but the desire for a refund must be apparent. Although the written letters were timely and stated the grounds on which the protest is lodged, the Insurers do not ask for their money back. The letters, as written, lay the ground for a protest suit under sections 112.051 and 112.052 of the tax code (requiring only that protest be in writing and state reasons for recovery of payment, and that suit be filed within 90 days).

When taxes are disputed, the tax code provides two distinct types of suits, with different procedural requirements: protest suits and refund suits. *Compare id.* ' 112.051, .052 (authorizing protest suits), *with id.* ' 112.151 (authorizing refund suits). Although intuitively it seems that when a taxpayer pays a tax Aunder protest,@that person contends that she does not owe the tax and thus wants her money back, the legislature has clearly indicated that a tax-refund claim and the corresponding procedures outlined in section 112.051 are an exclusive remedy for a tax-refund suit, which is distinct procedurally from a protest suit.[9] On the evidence of the protest letters alone, we would conclude that the Insurers had not filed Arefund claims@ and had, therefore, failed to exhaust their administrative remedies.[10]

---

[9] It seems incongruous that for a protest suit, a taxpayer need not *specifically* ask for a refund in the protest letter, although a taxpayer=s hoped-for result under either a tax-refund or protest-payment proceeding is the same: recovery of taxes already paid. *Compare* Tex. Tax Code Ann. ''

11

112.051, .052 (West 2001), *with id.* ' 112.151 (West 2001). The tax code gives little guidance as to whether a claim more appropriately qualifies as a refund or a protest suit. However, the purpose behind protest suits is to provide an adequate legal remedy whereby a taxpayer may test the validity of a tax without having to resort to the traditional equitable remedy of injunction, which would restrain the state=s collection of the tax and disrupt the tax-collection process. *Cobb v. Harrington*, 190 S.W.2d 709, 713 (Tex. 1945); *Bernard Hanyard Enters., Inc. v. McBeath*, 663 S.W.2d 639, 643 (Tex. App.CAustin 1983, writ ref=d n.r.e.). A refund suit, on the other hand, serves the purpose of empowering the Comptroller, upon her determination, to refund the payment of certain taxes found to have been paid through mistake of fact or law, thereby relieving the legislature of time-consuming claims made directly to lawmakers. *See Motorola, Inc. v. Bullock*, 586 S.W.2d 706, 708-710 (Tex. Civ. App.CAustin 1979, no writ). It would appear from the purposes behind these two tracks, therefore, that the Insurers= claims fell more appropriately under the protest-track. However, if they have adequately exhausted the administrative remedies under the refund-track, there is nothing in the tax code that prevents the Insurers from bringing this suit as a refund suit.

[10] In this vein, at least Lexington and Landmark had also not completely fulfilled the requirement in sections 111.105 and 112.051 pertaining to motions for rehearing. Section 112.051 requires that a claimant have filed a motion for rehearing pursuant to section 111.105. That section, in turn, implies that to file a motion for rehearing, a claimant must have first requested a hearing, had the hearing, and then filed a motion for rehearing:

> A person claiming a refund under section 111.104 . . . is entitled to a hearing on the claim if the person requests a hearing . . . . A decision of the comptroller following a hearing on a claim for refund becomes final 20 days after service on the claimant of the notice of the order or decision. A tax refund claimant who is dissatisfied with the decision on the claim is entitled to file a motion for rehearing.

Tex. Tax Code Ann. ' 111.105 (West 2001). The protest letter and motion for rehearing on which Lexington and Landmark rely were filed on the same day, and there is no indication in the record that the requisite hearing request and actual hearing occurred.

12

However, we must analyze the protest letters in the context of the particular proceedings pending between the Insurers and the Comptroller. Since the Insurers requested a redetermination of the tax assessed in late 1997, the Comptroller has been aware of their basic legal argument that they owe no tax whatsoever. By the time the Insurers had filed their respective protest letters, they and the Comptroller had been embroiled in conflict over the proper interpretation of Former Article 1.14-1, section 11(a) of the insurance code and the Insurers= liability, if any, for the unauthorized insurance premium tax. The Insurers had long asserted their legal arguments that they were authorized, not unauthorized, insurers. The Comptroller had iterated her opposing interpretation of the statute. Hearings had been conducted in compliance with the Insurers= requests for redetermination of the tax assessments. Negotiations had occurred between the Insurers and the Comptroller, resulting in agreed motions for rehearing and reductions in the amounts owed due to records the Insurers were able to produce. Both the Comptroller and the Insurers were on fair notice of the opposing side=s position. The Insurers= final motions for rehearing (in June 2000 for American International and in June 1999 for Lexington and Landmark) merely reiterated their contention that they owed no taxes at all, for all the reasons they had been urging throughout the redetermination process.

The policy behind the exhaustion-of-administrative-remedies doctrine is to allow the agency to resolve disputed issues of fact and policy and to assure that the appropriate body adjudicates the dispute. *Essenburg v. Dallas County*, 988 S.W.2d 188, 189 (Tex. 1998). Similarly, the policy seeks to encourage parties to resolve their dispute without resorting to litigation when an administrative procedure is provided for that purpose. *See Vela v. Waco Indep. Sch. Dist.*, 69 S.W.3d 695, 702 (Tex. App.CWaco

13

2002, pet. withdrawn). Also, there are several long-recognized exceptions to the doctrine: (1) where an injunction is sought and irreparable harm would result; (2) where the administrative agency cannot grant the requested relief; (3) when the issue presented is purely a question of law; (4) where certain constitutional issues are involved; and (5) where an administrative agency purports to act outside its statutory powers. *Gibson v. Waco Indep. Sch. Dist.*, 971 S.W.2d 199, 201-02 (Tex. App.CWaco 1998), *vacated on other grounds*, 22 S.W.3d 849 (Tex. 2000); *see Larry Koch, Inc. v. Texas Natural Res. Conservation Comm=n*, 52 S.W.3d 833, 839-40 (Tex. App.CAustin 2001, pet. denied). In the case of an agency allegedly acting outside of its statutory powers, the Apurposes underlying the exhaustion rule are not applicable: judicial and administrative efficiency are not served, and agency policies and expertise are irrelevant, if the agency=s final action will be a nullity.@ *Larry Koch*, 52 S.W.3d at 840. Here, the Insurers insisted that the Comptroller had no authority to declare them unauthorized insurers because such authority rested exclusively with the Commissioner of Insurance. If the Insurers were to prevail on their theory that the Comptroller was acting outside her authority in assessing these taxes against an eligible surplus lines insurer, the administrative requirements for a refund in the tax code would be mere formalities, as the Comptroller=s actions in assessing the taxes would ultimately be Anullities.@ *See id.* at 840.

Although the Insurers were seeking more than declaratory relief, the policy behind the exhaustion doctrine is not served by denying the Insurers their day in court after the detailed and lengthy process that had occurred here. To the contrary, the policyCat this stage in the proceedingsCwould be better served if a court resolved the issue because a court is the more Aappropriate body@ to adjudicate the fundamental question of law at issue here: the meaning of Former Article 1.14-1, section 11. *See*

14

*Essenburg*, 988 S.W.2d at 189. We conclude that under these particular facts, it would have Aserved no purpose@ for the Insurers to file technically correct refund claims and proceed through duplicative hearings when the Comptroller was on notice of the legal bases for their claims.

The Insurers cite our opinion in *Sharp v. International Business Machines Corp.* for the proposition that courts ought not strictly apply procedural requirements under certain circumstances when to do so would be an exercise in futility, while relaxation of the requirements would Aachieve judicial efficiency and prevent unnecessary waste of judicial resources.@ 927 S.W.2d 790, 795 (Tex. App.CAustin 1996, writ denied); *see also Estepp v. Miller*, 731 S.W.2d 677, 680 (Tex. App.CAustin 1987, writ ref=d n.r.e.). In *International Business Machines*, IBM filed an initial refund request with the Comptroller, which the Comptroller denied because it was filed after the four-year limitations period had expired. *International Bus. Machs.*, 927 S.W.2d at 791. IBM filed a motion for rehearing, which the Comptroller denied. Then, IBM filed a second refund request for the same tax year, seeking an amount in addition to that sought in the first request. Before the Comptroller took any action on this second request, IBM filed suit in district court contesting the Comptroller=s denial of the first request and seeking a refund in an amount totaling the first and second requests. *Id.* IBM concurrently requested a hearing on its second request, which was denied, but never filed a motion for rehearing on this request, as required by the tax code. *Id.* at 792; *see* Tex. Tax Code Ann. **'** 112.151. In the lawsuit, the Comptroller asserted that the court had no jurisdiction over the second refund claim because no motion for rehearing had been filed. *International Bus. Machs.*, 927 S.W.2d at 795. This Court held that, nevertheless, it had jurisdiction over both refund claims because the determination as to whether IBM=s second request was timely filed depended completely on whether its first

15

request was filed within the limitations period.  *Id.*  AIt would have served no purpose for IBM to obtain a hearing on its Second Request . . . when its First Request, filed over two years before, was denied because it was not timely filed.@  *International Bus. Machs.*, 927 S.W.2d at 795.

The IBM case is distinguishable because IBM already had some basis for a valid lawsuit as to its first refund claim.  The Insurers here could not have sued the Comptroller for any refund if we applied the strictly technical requirement of a refund claim.  Nevertheless, the policy behind relaxing administrative requirements if their strict application would produce Aan exercise in futility,@s*ee id.*, 927 S.W.2d at 795, applies here.

We conclude that under the facts of this case, the Insurers have substantially met the requirements of section 112.151.  The Comptroller had studied the issue of the applicability of article 1.14-1, section 11(a) to these insurers closely, and had consistently resolved that legal question against them.  The parties had attempted to resolve their dispute through the administrative process.  Finally, the Insurers determined that a lawsuit was necessary to determine the statute=s applicability.  Because the Insurers rely on a strictly legal argument that they could not be taxed under the statute authorizing taxes on unauthorized insurance premiums, and in light of the protracted administrative process already completed, their payment under protest could not reasonably be regarded as anything but a request for a refund.  Indeed, their motions for rehearing made this claim explicit.  After the Comptroller denied the motions for rehearing, the Insurers filed their lawsuits.  Under these particular facts, we hold that the Insurers sufficiently exhausted their administrative remedies by filing Arefund claims@ with the Comptroller and pursuing the additional requirements under the tax code.  We overrule the Comptroller=s first issue.

16

*Declaratory judgment*

In its second issue, the Comptroller asserts that the trial court also lacked jurisdiction over the Insurers= declaratory-judgment claim, because that claim cannot stand on its own. To support this argument, it cites *State v. Morales*, which declared that the Uniform Declaratory Judgments Act is Amerely a procedural device for deciding cases already within a court=s jurisdiction@ and that A[a] litigant=s request for declaratory relief cannot confer jurisdiction on the court, nor can it change the basic character of a suit.@ 869 S.W.2d 941, 947 (Tex. 1994); *see* Tex. Civ. Prac. & Rem. Code Ann. ' ' 37.001-.011 (West 1997 & Supp. 2004). However, our holding that the Insurers exhausted their administrative remedies before filing their suit confers jurisdiction on the district court. Thus, the declaratory-judgment action need not stand on its own, but in conjunction with the Insurers= refund suit. We overrule the Comptroller=s second issue.

*Unauthorized insurance premium tax*

The trial court declared that the unauthorized insurance premium tax outlined in Former Article 1.14-1, section 11(a) does not apply to eligible surplus lines insurers. *See* Former Article 1.14-1, ' 11(a).[11] The Comptroller asserts that although a surplus lines insurer may be Aeligible,@ that status does not

---

[11]    Former Article 1.14-1, section 11(a) provided in relevant part:

Except as to premiums on lawfully procured surplus lines insurance and premiums on independently procured insurance on which a tax has been paid pursuant to this Article or Article 1.14-2, every unauthorized insurer shall pay to the State Board of Insurance before March 1 next succeeding the calendar year in which the insurance was so effectuated, continued or renewed a premium receipts tax of 4.85 percent of gross premiums charged for such insurance on subjects resident, located or to be performed in this state.

necessarily prevent such insurer from acting in an Aunauthorized@ manner that then subjects it to the premium-receipts tax. When the Insurers failed to use licensed Texas surplus lines agents, their issuance of the subject policies was unauthorized and made them liable for the tax. We begin our discussion with the text of Former Article 1.14-1, section 11(a), the statute that was in effect during the applicable time period.

---

Former Article 1.14-1, ' 11(a). This article was amended, effective September 1993, to read:

> Except as to premiums on insurance procured by a licensed surplus lines agent from an eligible surplus lines insurer as defined in Article 1.14-2 and premiums on independently procured insurance on which a tax has been paid pursuant to this Article or Article 1.14-2, every unauthorized insurer shall pay to the comptroller, on a form prescribed by the comptroller, before March 1 next succeeding the calendar year in which the insurance was so effectuated, continued or renewed or another date prescribed by the comptroller a premium receipts tax of 4.85 percent of gross premiums charged for such insurance on subjects resident, located or to be performed in this state.

Act of May 27, 1993, 73d Leg., R.S., ch. 999, ' 6, 1993 Tex. Gen. Laws 4373, 4375, *amended by* Act of May 29, 1993, 73d Leg., R.S., ch. 685, ' 3.03, 1993 Tex. Gen. Laws 2559, 2575, *repealed by* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, ' 5, 1999 Tex. Gen. Laws 486, 538.

Former Article 1.14-1 is entitled AUnauthorized Insurance.@ Its purpose is to afford the Board of Insurance and the courts of Texas personal jurisdiction over an out-of-state insurer doing business in Texas without a certificate of authority from the Board. *Risk Managers Int=l, Inc. v. State*, 858 S.W.2d 567, 571 (Tex. App.CAustin 1993, writ denied); Act of May 27, 1993, 73d Leg., R.S., ch. 999, ' 1, 1993 Tex. Gen. Laws 4373, 4373, *repealed by* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, ' 5, 1999 Tex. Gen. Laws 486, 538.[12] Before 1993, section 11 of the article required unauthorized insurers to pay to the Board of Insurance a premium-receipts tax: A[e]xcept as to premiums on lawfully procured surplus lines insurance and premiums on independently procured insurance on which a tax has been paid pursuant to this

---

[12]  Article 1.14-1, section 1 provided in relevant part:

The purpose of this Article is to subject certain persons and insurers to the jurisdiction of the State Board of Insurance . . . and of the courts of this state . . . . The Legislature declares that it is a subject of concern that many residents of this state hold policies of insurance issued by persons and insurers neither authorized to do insurance business in this state nor qualified as eligible surplus lines insurers as defined in Article 1.14-2 . . . . The Legislature declares that it is also concerned with the protection of residents of this state against acts by persons and insurers not authorized to do an insurance business in this state by the maintenance of fair and honest insurance markets, by protecting the premium tax revenues of this state, by protecting authorized persons and insurers . . . from unfair competition by unauthorized persons and insurers and by protecting against the evasion of the insurance regulation laws of this state.

Act of May 27, 1993, 73d Leg., R.S., ch. 999, ' 1, 1993 Tex. Gen. Laws 4373, 4373, *repealed by* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, ' 5, 1999 Tex. Gen. Laws 486, 538.

Article or Article 1.14-2, *every unauthorized insurer shall pay* . . . a premium receipts tax of 4.85 percent of gross premiums charged.@ Former Article 1.14-1, ' 11(a) (emphasis added).[13]

Notably, the liability for the premium-receipts tax hinges on whether an insurer is Aunauthorized.@ The statute excepts those premiums received on a lawfully procured surplus lines insurance policy or on an independently procured insurance, if a premium tax has been paid. Unauthorized insurers who receive the excepted premiums on which a tax has been paid are not liable for the premium-receipts tax imposed by section 11. Under this statutory scheme, we must engage in a two-step analysis to determine whether the eligible Insurers can ever be considered Aunauthorized@ and if so, whether they qualify for either of the exceptions.

To determine whether the Insurers may be considered unauthorized, we turn first to section 2 of Former Article 1.14-1, which broadly defines acts that may constitute doing insurance business in Texas. They include the making of an insurance contract, the receiving of any premium, the issuance of a contract of insurance to a Texas resident, and Aany other transaction of business in this state by an insurer.@ *See* Act of May 29, 1993, 73d Leg., R.S., ch. 685, ' 3.031, 1993 Tex. Gen. Laws 2559, 2577, *repealed*

---

[13] Former Article 1.14-1, section 11(a) was amendedCeffective September 1993Cto require unauthorized insurers to pay the tax to the comptroller rather than the State Board of Insurance. *See* Act of May 29, 1993, 73d Leg., R.S., ch. 685, ' 3.04, 1993 Tex. Gen. Laws 2559, 2578, *repealed by* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, ' 5, 1999 Tex. Gen. Laws 486, 538.

*by* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, ' 5, 1999 Tex. Gen. Laws 486, 538. The definition of Ainsurance business,@ therefore, is global, encompassing every conceivable form of business conducted by an insurer. Subsection (b) of section 2 then exempts certain transactions from the umbrella definition of Ainsurance business.@ The Alawful transaction of surplus lines insurance@ and Aindependently procured insurance@ are exempted. *See* Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, ' 13.11(b), 1990 Tex. Gen. Laws 1, 96, *amended by* Act of May 29, 1993, 73d Leg., R.S., ch. 685, ' 3.03, 1993 Tex. Gen. Laws 2559, 2576, *repealed by* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, ' 5, 1999 Tex. Gen. Laws 486, 538 (AThe provisions of this section do not apply to: (1) The lawful transaction of surplus lines insurance . . . [and] (4) Transactions involving contracts of insurance procured through negotiations occurring entirely outside of this state which are reported and on which a premium tax is paid in accordance with this Article.@) (hereinafter cited as Former Article 1.14-1, ' 2(b)). Section 3 explains what makes a transaction an act of unauthorized insurance: A[n]o person or insurer shall directly or indirectly do any of the acts of an insurance business set forth in this Article *except as provided by and in accordance with the specific authorization of statute.@ See* Act of May 27, 1985, 69th Leg., R.S., ch. 918, ' 2, 1985 Tex. Gen. Laws 3088, 3089, *repealed by* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, ' 5, 1999 Tex. Gen. Laws 486, 538 (emphasis added). In other words, an insurer has conducted the unauthorized business of insurance when it engages in any of the listed transactions (collecting premiums) in a manner that is not specifically authorized by statute. Furthermore, it is the engaging in such a transaction that makes an insurer Aunauthorized.@ Thus, we must determine in what manner a surplus lines insurer is authorized to conduct insurance business in Texas. For this, we turn to Former Article 1.14-2.

21

The purpose of Former Article 1.14-2, entitled ASurplus Lines Insurance,@ is to Aprovide for the regulation, taxation, supervision and control@ of insurance transactions that are Aentered into by citizens of this state with unauthorized insurers through a surplus lines agent as a result of difficulty in obtaining coverage from licensed insurers.@ Act of Apr. 27, 1967, 60th Leg., R.S., ch. 185, ' 2, 1967 Tex. Gen. Laws 400, 408, *repealed by* Act of May 22, 2001, 77th Leg., R.S., ch. 1419, ' 31(b)(1), 2001 Tex. Gen. Laws 3658, 4208. This reveals a clear legislative intent that surplus lines insurance be obtained through a licensed Texas agent:

> In order to properly regulate and tax such unauthorized insurance . . . the Legislature herein provides an orderly method for the insuring public of this state to effect insurance with unauthorized insurers through qualified, licensed and supervised surplus lines agents in this state . . . so that such insurance coverage may be obtained by residents of this state to the extent that the coverage is not procurable from duly licensed, regulated insurers conducting business in this state.

*Id.* The repeated references to Aunauthorized@ insurers and insurance in section 1 reveal an underlying premise: that surplus lines insurers are unauthorized, absent express statutory authorization to conduct insurance business. Section 3 of the article provides authorization for surplus lines insurers, Asubject to the following conditions: . . . The insurer must be an eligible surplus lines insurer . . . [and] [t]he insurance must be placed through a licensed Texas surplus lines agent resident in this state.@ *See* Act of May 27, 1993, 73d Leg., R.S., ch. 999, ' 10, 1993 Tex. Gen. Laws 4373, 4377, *repealed by* Act of May 22, 2001, 77th Leg., R.S., ch. 1419, ' 31(b)(1), 2001 Tex. Gen. Laws 3658, 4208. If surplus lines insurance is not placed through a licensed Texas surplus lines agent, the transaction does not qualify as the Athe *lawful*

22

transaction of surplus lines insurance.@ *See* Former Article 1.14-1, ' 2(b) (emphasis added).  Indeed, the transaction cannot meet the definition of A*lawfully* procured surplus lines insurance@ in section 11 of Former Article 1.14-1.  *See* Former Article 1.14-1, ' 11(a) (emphasis added).

We conclude that surplus lines insurers who do not place surplus lines insurance through a licensed Texas surplus lines agent have engaged in unauthorized insurance and become Aunauthorized insurers@ liable for the premium tax imposed by Former Article 1.14-1, section 11.  Only an insurer who receives premiums on independently procured insurance on which a premium-receipts tax has been paid is excepted from this liability.  We conclude that surplus lines insurersCeligible or notCare liable for the unauthorized insurance premium tax imposed by Article 1.14-1 if they have not placed the insurance through a licensed Texas surplus lines agent or if the insurance has not been independently procured.

Citing *Texas Unemployment Comp. Comm=n v. Bass*, 151 S.W.2d 567, 570 (Tex. 1941), the Insurers contend that the statute must be construed against the taxing authority.  We disagree. The Insurers are actually seeking an exemption from the tax on unauthorized insurance premiums.  To conduct the authorized business of insurance as an insurer not licensed in this state, the Insurers must comply with the statutory requirements.  When a taxpayer claims an exemption, the court is to strictly construe the exemption provision against the taxpayer.  *Bullock v. National Bancshares Corp.*, 584 S.W.2d 268, 272 (Tex. 1979).  Moreover, Aa person or entity claiming the benefit of a statutory exemption has the burden of proving every fact essential to the invocation of the exemption.@  *Risk Managers*, 858 S.W.2d at 570 (citing *Cramer v. Shepard*, 167 S.W.2d 147 (Tex. 1942)).  To prevail, the Insurers must be able to prove that they fell under one of the exemptions to the unauthorized insurance premium tax: that the premiums they

23

collected were for (1) lawfully procured surplus lines insurance on which a tax had been paid or (2) independently procured insurance on which a tax had been paid.[14] They failed to meet this burden. We sustain the third issue and hold that the district court erred in declaring that eligible surplus lines insurers are not subject to Former Article 1.14-1.

**CONCLUSION**

---

[14] We recognize the Insurers= predicament that they have not maintained the necessary records to enable them the benefit of the exemption because of the surplus lines insurance industry=s understanding of state premium-receipts tax law as imposing the tax burden on only the agent and the Insurers= business practice to contractually place the burden of complying with a particular state=s laws on the brokers and agents. However, the Texas statutes are clear about what constitutes the lawful practice of insurance in Texas, and it was the Insurers= burden to comply with Texas laws if they desired to insure Texas risks.

The Insurers substantially exhausted their administrative remedies before filing suit in district court, and therefore the trial court had jurisdiction over their refund suit and their related claims. Because the trial court erred in interpreting Former Article 1.14-1 of the insurance code, we reverse its grant of summary judgment in favor of the Insurers and remand this cause for further proceedings not inconsistent with this opinion.

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Reversed and Remanded

Filed:   February 20, 2004